**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0564n.06
Filed: August 7, 2006

No. 03-3691

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ARMAND BALLIU, | ) | |
| | ) | |
| **Petitioner,** | ) | **ON PETITION** FOR REVIEW |
| v. | ) | OF AN ORDER OF THE |
| | ) | BOARD OF IMMIGRATION |
| ALBERTO GONZALES, | ) | APPEALS |
| ATTORNEY GENERAL | ) | |
| | ) | |
| **Respondent.** | ) | **O P I N I O N** |
| | ) | |

**Before: Moore, Griffin, and Cudahy,[*] Circuit Judges.**

**RICHARD D. CUDAHY, Circuit Judge.**

Armand Balliu seeks review of a final order of the Board of Immigration Appeals (BIA) affirming without opinion the Immigration Judge's (IJ's) denial of his request for asylum, withholding of removal and protection under the Convention Against Torture (CAT). Balliu argues that the IJ erred in concluding that he had not established eligibility for asylum and withholding of removal (on the basis of political opinion and membership in a social group), and protection under the CAT. He further argues that the IJ erred by denying him a full and fair hearing in violation of his due process rights. Additionally, Balliu argues that the BIA erred in

_____

[*]The Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation.

1

streamlining his case rather than sending it to a three-member review panel, and, finally, that the BIA erred in affirming without opinion the IJ's decision. For the reasons set forth below, we deny Balliu's petition for review on all counts.

## I. BACKGROUND

Balliu is a native and citizen of Albania. Balliu's great uncle, Abaz Ermenj, is one of the founders, and the current chairperson, of the Balli Kombetar Party in Albania. The Party is an anti-communist Albanian nationalist organization founded in roughly 1942. It has offices worldwide with 30,000 to 40,000 members. Balli Kombetar was initially organized as a military group with a political wing. The Party has, at times, held a small number of seats in the Albanian Parliament.

Balliu's family is highly political and active in the Balli Kombetar Party. Balliu, who joined the Party when he was eighteen, claims that his family has long been persecuted for its involvement in this political party and for its anti-communist political views. His great uncle, Ermenji, fled to France, where he lived in exile during the communist period. Since the fall of the communist regime, Ermenji has ended his exile and has returned to Albania for visits. Additionally, another great-uncle of Balliu and Balliu's maternal grandfather were killed by communists in the 1940s. Around this time, the rest of Balliu's family was interned in a village where they were treated like slaves. Balliu testified that his cousin Bardhyul Balliu, who was active in anti-socialist politics, died in police custody in the capital city of Tirana after being abused. The 1999 U.S. Department of State Country Report on Human Rights Practices in Albania discusses this incident. U.S. Dep't of St., Country Reports on Human Rights Practices 1999, sec. 1, (Feb. 25, 2000). Balliu's parents, who currently reside in Albania, are also active

Balli Kombetar members.

In 1992 the Communist Party in Albania was defeated by the Democratic Party in the national elections. In 1997, following a five-month period of chaos and anarchy in the country, the Socialist Party won 111 out of the 155 parliamentary seats in the national parliamentary elections. In 2005, the Democratic Party regained control of the Albanian Parliament, receiving 81 of the 140 available parliamentary seats.

Balliu believes he will be in danger if he returns to Albania, partly because it is known that he is the future of the Balli Kombetar Party in his town. He argues that he will be persecuted or killed by members of the Socialist Party because many members of the Socialist Party were supportive of, and active in, the Communist Party or are related to old communist leaders. Balliu testified to several incidents in which he was targeted by Emil Tushka, the son of the Secretary of the Socialist Party in Gramsh (one of Albania's thirty-six districts), by Nor Hasa, the brother of the Chairman of the Albanian National Intelligence Service (SHIK) and by several friends of these individuals. At the time this case was heard by the IJ, the Socialist Party was still in power in Albania. Currently, the Democratic Party is in power, though members of the Socialist Party continue to reside in Albania and are active in the Parliament.

Balliu testified that in March 1997, when Albania was experiencing severe civil disorder and unrest, he was performing his required military service. On a specific day during March, groups began burning the city hall, the bank, the police station and the local court in order to destroy documents from the communist era. Balliu's commanding officer asked him to hide three boxes of military documents as well as ammunition in his house. After Balliu and his officer went to Balliu's house to store these materials, they were stopped by five people,

3

including Tushka and Hasa. These men beat Balliu and accused him of trying to save the documents. Ballui believes that these individuals wanted to burn the documents because they were generated while their parents were Communist Party leaders in Gramsch, and presumably these documents could implicate them criminally. Balliu treated his own injuries from the beating.

After completing his military service in October 1997, Balliu returned to work as an auto parts dealer. In September 1998, he attended an anti-socialist rally to protest the assassination of Democratic Party opposition leader Azem Hajdari. Balliu was arrested after this event at a coffee shop. He testified that he was detained overnight and was hit with a club. His face was swollen and bruised and he lost three teeth. Following his release from custody the next day, he had to be treated in the hospital. Balliu was unable to work during the full two weeks it took him to recover from his injuries. Balliu also testified that he believes he was being followed after his release from prison. Soon after Balliu's return to work, his store was vandalized. In October, 1998, he arrived at work and found a threatening note left in his store which read, "You dirty nationalist! Why do you continue to persist?" Balliu decided to sleep in his store following this event to protect his property. On the night of November 15, 1998, when Balliu was sleeping in the shop, it was set on fire. Balliu testified that when he awoke he heard the same voices of the individuals who had attacked him for protecting the military documents. Balliu managed to escape the fire, but his property was destroyed. Following this incident, Balliu went into hiding by living with his cousin for several months. He testified that the police asked his parents about his whereabouts when he was in hiding.

On June 8, 1999, Balliu entered the United States with a fraudulent passport. On August

18, 2000, the Immigration and Naturalization Service (INS) charged Balliu with removal under Section 237(a)(1)(A) of the Immigration and Nationality Act. The notice to appear was filed with the court on August 21, 2000.  Balliu, through counsel, admitted the allegations and conceded that he was subject to removal.  However, in lieu of removal he requested relief based on eligibility for asylum, withholding of removal to Alabania and relief under CAT.  In the alternative, he requested voluntary departure.

On May 4, 2001, the IJ issued an oral decision in which she found Balliu subject to removal as charged, denied his applications for relief and CAT protection, denied his request for voluntary departure, and ordered him removed from the United States to Albania. The IJ concluded that Balliu had not established that he was entitled to relief based on several factual determinations. First, the IJ found that because Balliu was not a political leader and did not have close ties to his great-uncle such that Balliu might be considered a political successor, the reasonableness of his fear of persecution was reduced.  Further, the fact that Balliu's great-uncle and parents, members of the Balli Kombetar party, are able to live unharmed in Albania further reduces the reasonableness of Balliu's fear of persecution.  The IJ also stated that because the United States Department of State Country Reports for Albania reported that Albania was experiencing widespread civil disrest affecting the general population at the time Balliu testified he was attacked, Balliu had not been able to prove that he had suffered more than the general population in Albania during that period.

Balliu appealed the IJ's decision to the BIA.  On April 16, 2002, the BIA affirmed the decision of the IJ without opinion.  This petition for review followed.

5

## II. DISCUSSION

*A. Asylum, Withholding of Removal, and Protection Under the CAT*

Balliu argues that the IJ erred in denying his petition for asylum. The Attorney General has discretion to grant asylum to any alien who qualifies as a refugee. In order to demonstrate refugee status, an alien must present specific facts demonstrating that he or she is unable or unwilling to return to his or her country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A). An applicant for asylum must provide specific factual information to demonstrate that he or she has suffered past persecution or has a well-founded fear of future persecution based on one of five protected grounds. *Koliada v. INS*, 259 F.3d 482, 487 (6th Cir. 2001). In cases such as this, where the BIA affirmed the IJ's decision without opinion, we review the IJ decision as a final administrative order. *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). We review the IJ's factual determinations about Balliu's eligibility for asylum under a substantial evidence test. *Id.* We may reverse the determination of the IJ only if the evidence presented by Balliu is "so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution." *Id.* at 702-03 (citing *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)). This highly deferential standard requires us to uphold decisions below if they are supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Koliada v. INS*, 259 F.3d at 486 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). We may not reverse an IJ's decision "simply because [we are] convinced that [we] would have decided the case differently." *Adhiyappa v. INS*, 58 F.3d 261, 265 (6th Cir. 1995) (internal quotation marks omitted).

Balliu did not produce adequate evidence to meet the high burden of proof required for us to determine that the IJ erred in denying him asylum. First, the IJ determined that Balliu did not present evidence that proved he suffered more acutely than other persons in the population of Albania during the period of general civil strife occurring in the country at the time of the attacks on Balliu. This court's "decisions demonstrate that to create a presumption of a well-founded fear of future persecution, the applicant must establish that he or she was specifically targeted by the government for abuse based on a statutorily protected ground and was not merely a victim of indiscriminate mistreatment." *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005). In *Daneshvar v. Ashcroft*, 355 F.3d 615, 624-25 (6th Cir. 2004), this court declined to reverse the denial of asylum to an Iranian man because, though there were widespread human rights abuses in Iran, he had not presented any "credible evidence that he [would] be singled out for different treatment if he [was] deported back to Iran." *Id.* at 625. Additionally, in *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) (citing *Meghani v. INS*, 236 F.3d 843, 847 (7th Cir. 2001)), we found that an alien was not entitled to asylum because he had failed to demonstrate that the abuse he endured came from persecution rather than from "civil unrest between competing political factions."

Here, the IJ relied on the United States Department of State Country Reports to aid in her determination that Balliu was not specifically targeted. This Court has previously relied on Country Reports for Albania when considering a political persecution claim, and has found a Country Report to provide substantial evidence for the IJ's determination. *See Sterkaj v. Gonzales*, 439 F.3d 273, 276 (6th Cir. 2006). The 1999 Albania Country Report states that there was "a 5-month period of chaos and anarchy," both social and political, in 1997. U.S. Dep't of

7

St., Country Reports on Human Rights Practices in Albania 1999 (Feb. 25, 2000). There were complaints about police behavior and reports that police in the country were "largely untrained and often unreliable." *Id.*

The IJ also reasonably found that the Country Reports and Asylum Profiles further discredited Balliu's claim because they state that Albania is a republic with a multi-party Parliament, a Prime Minister and a President elected by the Parliament. There is a constitution, and the constitution states that the Government is based on a system of elections that are free, equal, general and periodic. *Id.* Additionally, a 1997 general election was considered by international monitors to be relatively legitimate, and the 1999 Country Report further stated that the right to peaceful assembly is generally respected. *Id.* Additionally, the 1999 Country Report stated that in that year, there were no clear cases of detainees being held strictly for political reasons. Additionally, if politically-motivated harassment or detention were to occur, the Report found that opposition political leaders are most likely to face such treatment. *Id.*, sec. 1.

The evidence Balliu presented to suggest that he was specifically targeted does not compel a conclusion contrary to that reached by the IJ. Balliu testified that when he was attacked while serving in the army, and when his store was set on fire, he recognized the perpetrators as individuals who were members of the Socialist Party, who had familial Communist Party ties and who knew of Balliu's connection to the Balli Kombetar Party. Additionally, during the first incident when he was attacked in the military, he testified that one of his attackers called him a "foul Baliste," which Balliu believed referred to his involvement in the Balli Kombetar Party. While the name calling evidence could be interpreted to mean that Balliu was targeted because of his direct connection to the Balli Kombetar Party, it nonetheless

8

does not meet the high standard of proof necessary for us to find that the IJ erred. Taking into account all of the other evidence, the name calling could also be reasonably interpreted to mean simply that Balliu was attacked during a period of general political and social chaos when various political groups were fighting and struggling for power. Balliu's connection to the military, not his involvement in the Balli Kombetar Party, may have been the main reason for both the attack and the name calling.

Balliu also presented a newspaper article to support his claim that he was specifically targeted due to his political affiliation with the Balli Kombetar Party. The article identified Balliu by name, stated that his shop was burned and stated that he was threatened because of his political affiliation with the Balli Kombetar in 1997 and 1998. However, the IJ did not find this newspaper article credible and determined that it was biased based on the expert testimony of Dr. Berndt Fischer, a professor, author and lecturer on Albania and the Balkins. Dr. Fischer testified that all newspapers in Albania are very political, and he was thus skeptical of news articles because of their political nature. The IJ also found it suspect that the newspaper reported on incidents from 1997 and 1998 in May 2000. Thus, the IJ determined that she could not give the newspaper substantial weight in her determination, which, considering Dr. Fischer's testimony, was a reasonable conclusion.

Balliu also pointed the Court to the section of the 1999 Country Report that discusses the fate of Bardhyl Balliu, a cousin of the petitioner. The Report states that Bardhyl was taken into police custody and died while awaiting trial. The fate of Bardhyl is reported in the context of a section concerning police committing extrajudicial killings. The Report does not suggest, however, that Bardhyl was targeted due to his political persuasion or affiliation with the Balli

9

Kombetar Party. *Id.* This evidence does not, therefore, persuade us that the IJ's findings were unreasonable.[1]

The IJ carefully considered Balliu's political leader status. However, the IJ ultimately determined that Balliu failed to present evidence to prove that he was a political leader, and that his lack of political status reduced the reasonableness of his fear of political persecution. This finding was reasonable given that the 1999 Country Report states that there were no politically motivated disappearances or reports of political prisoners during that year. *Id.* The report further states that (unlike Balliu) opposition political leaders were most likely to face politically-motivated harassment or detention. *Id.*

The Record supports the IJ's conclusion that Balliu was a fairly junior member of the Balli Kombetar Party and that he did not hold a title or position within the party. Balliu testified that his duties involved helping the party in local political activities by acting as a volunteer driver and delivering mail and documents, and that he participated in political rallies. These activities support a finding that Balliu was not a political leader.

The IJ also considered the fact that Balliu's great-uncle, who is a political leader of the Balli Kombetar Party, has been able to travel freely in Albania; further, Balliu's parents, who are involved in the party, have been living freely and without harm in Albania. The IJ reasonably

---

[1]At oral argument, Balliu argued that *Kalaj-Pali, et al. v. Gonzales*, No. 04-4247, 2006 U.S. App. LEXIS 9592, at \*14 (6th Cir. Apr. 14, 2005) provides a useful analysis under which we should consider Balliu's case. There, this Court ruled that the IJ erred in not finding a clear nexus between the threats Kalaj-Pali and his family suffered and their political activities. However, *Kalaj-Pali* can be distinguished from the present case because there was more evidence that Kalaj-Pali was a political leader, and there was more evidence to suggest that the attacks and threats Kalaj-Pali endured were political in nature and specifically targeted at Kalaj-Pali because of his strong ties to and work with the Democratic Party. Additionally, *Kalaj-Pali* is an unpublished case and thus is not controlling.

concluded that these facts reduce the reasonableness of Balliu's fear of persecution. *See Hakeem v. INS*, 273 F.3d 812, 816-17 (9th Cir. 2001) ("An applicant's claim of persecution upon return is weakened, even undercut, when similarly-situated family members continue to live in the country without incident.").

Thus, the IJ's determination that Balliu is not entitled to asylum based on the evidence presented was reasonable, and we reject Balliu's petition on this claim.

Balliu also seeks review of the IJ's denial of withholding of removal and protection under the CAT. Withholding of removal must be granted if an applicant can establish a "clear probability" that his life or freedom would be threatened on account of one of the enumerated grounds. *INS v. Stevic*, 467 U.S. 407, 429 (1984). Because Balliu failed to meet the less difficult standard for asylum, he necessarily failed to meet the more stringent standard for withholding of removal. *Mullai v. Ashcroft*, 385 F.3d 635, 639 (6th Cir. 2004); *Daneshvar v. Ashcroft*, 355 F.3d 615, 625 (6th Cir. 2004) ("Because substantial evidence supports the Board's determination that Petitioner is ineligible for asylum, it therefore follows that he cannot satisfy the more stringent standard for withholding of deportation.").

Balliu has also failed to satisfy the standards to qualify for CAT relief. In order to qualify for CAT relief, a petitioner must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *See* 8 C.F.R. § 208.16(c)(2). While, for CAT relief, Balliu does not have to link the harm faced with the five protected grounds for asylum and withholding, *Castellano-Chacon v. INS*, 341 F.3d 533, 551-52 (6th Cir. 2003), the evidence presented does not meet the standard of showing that it is more likely than not that he will be tortured. He failed to prove there is a specific threat towards him due to his

11

political or familial ties, or that the past persecution he suffered was due to more than the general political unrest in Albania, which has since subsided. Thus, we cannot conclude that he is more likely than not to be tortured if he returns to Albania.

### B. Right to a Full and Fair Hearing

Balliu argues that he was deprived of due process because the IJ improperly conducted his hearing. He argues the IJ erred by beginning the examination of Balliu herself, questioning him from the bench in a prejudicial manner, denying him the opportunity to present all the evidence he had and by articulating prejudice regarding country conditions in Albania. Balliu provides few details about the specific behavior of the IJ, other than to note that the IJ began proceedings by questioning the petitioner in a "haphazard" fashion. Balliu also argues the IJ improperly took over the role of prosecutor in cross-examining him, without the benefit of direct examination.

We review a due process challenge to an IJ's manner of conducting a removal hearing de novo. *Ivezaj v. INS*, 84 F.3d 215, 220 (6th Cir. 1996). Aliens are entitled to due process of law in deportation proceedings under the Fifth Amendment. *Reno v. Flores*, 507 U.S. 292, 306 (1993). "A violation of due process occurs when 'the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case.'" *Hassan v. Gonzales*, 403 F.3d 429, 436 (6th Cir. 2005) (citing *Ladha v. INS*, 215 F.3d 889, 904 (9th Cir. 2000)). However, immigration judges have "broad discretion in conducting their hearings," and "mere intimidation or interruption by a judge does not render a hearing unfair." *Ahmed v. Gonzales*, 398 F.3d 722, 725 (6th Cir. 2005).

Balliu failed to show that the IJ's conduct was unreasonable and resulted in an unfair

12

hearing. Balliu does not cite specific instances of such conduct in his brief, and indeed, the transcript of the hearing shows no intimidating or hostile conduct on the part of the IJ. The IJ in fact overruled many of the government's objections to Balliu's exhibits, and rejected the government's claims that there were inconsistencies between various statements Balliu had made.

Balliu also argues that the IJ improperly took over the role of prosecutor in cross-examining the petitioner, without the benefit of direct examination. However, the record does not support this claim. An IJ has the authority to "interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). There is no indication in the record that the IJ exceeded her authority by questioning Balliu. The IJ asked Balliu several foundational questions at the beginning of the hearings, and questioned Balliu about most of the factual aspects of his claims for relief before counsel gave an opening statement. While the IJ did not explain the reasons for her questioning, given the numerous objections from the government regarding relevancy and authentication of Balliu's exhibits, we can assume she was attempting to gain further information in order to inform her evidentiary determinations. At no point did she restrict Balliu from providing additional testimony, as he claims.

*C. BIA Streamlining Procedure*

Balliu argues that the BIA erred by streamlining his case rather than submitting it to a three-member panel for review because the IJ made clearly erroneous factual determinations. In *Vasha v. Gonzales*, 410 F.3d 863, 876 (6th Cir. 2005) this court noted that "[w]hether an alien may challenge the BIA's use of its streamlining procedure . . . remains an open question before

13

this court." The court found, without deciding the question whether an alien may challenge the BIA's streamlining procedure, that Vasha would lose on this point because substantial evidence supported the IJ's determination that he was not eligible for asylum and was not eligible for withholding of removal. Likewise, here, Balliu is unable to prevail on this point because the IJ's decision was supported by substantial evidence, and Balliu was unable to show that the IJ erred in determining that he was not eligible for asylum, withholding of removal or CAT relief.

*D. BIA Summary Affirmance Without Opinion Procedure*

Balliu further argues that the BIA erred in summarily affirming the IJ's denial of his claims for relief without issuing a written opinion. A Board member who is initially assigned a case may affirm without opinion if:

> [T]he Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that (A) The issues on appeal are squarely controlled by existing Board or federal court precedent and do not involved the application of precedent to a novel factual situation; or (B) The factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case. 8 C.F.R. §1003.1(e)(4).

This court has not determined whether judicial review of the BIA's application of the affirmance without opinion procedure is appropriate. *See Denko v. INS*, 351 F.3d 717, 730 (6th Cir. 2003). However, in *Denko*, this court assumed review was appropriate without conclusively deciding the issue. We choose to follow this model here, and find that Balliu's challenge to the BIA's decision to use this approach fails because substantial evidence supports the IJ's conclusion that Balliu is not entitled to asylum or withholding of removal.

**III. CONCLUSION**

14

For the foregoing reasons, Balliu's petition for review is **DENIED**.